810 P.2d 178

**STATE of Arizona, Appellee,**

v.

**Richard Joseph BUCCINI, Appellant.**

**No. CR–90–0124–PR.**

Supreme Court of Arizona,
En Banc.

April 18, 1991.

Grant Woods, Atty. Gen. by Paul J. McMurdie and Diane M. Ramsey, Asst. Attys. Gen., Phoenix, for appellant.

Michael B. Grayson and Robert D. Nelson, Tucson, for appellee.

## OPINION

FELDMAN, Vice Chief Justice.

Richard Buccini petitioned for review, asserting that the court of appeals erred in reversing a superior court order suppressing evidence seized on a search warrant. *State v. Buccini,* 165 Ariz. 108, 796 P.2d 910 (Ct.App.1990). We granted review to clarify the appropriate standard to be used by an appellate court in reviewing the sufficiency of a redrafted search warrant affidavit under the procedure established in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct.

2674, 57 L.Ed.2d 667 (1978). *See* Rule 31.-19, Ariz.R.Crim.P., 17 A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## FACTS AND PROCEDURAL HISTORY

Shortly after midnight on May 8, 1988, a pipe bomb exploded in the carport of Howard Moore's Tucson home. Although Moore heard a loud explosion, he did not realize that his property had been damaged until the following morning. Moore then telephoned the police, and Officer Karn was dispatched to Moore's home to secure the area and make a report.[1] The bomb damaged the carport and Moore's automobile. Moore called Karn's attention to a note that read "drop it," which was stuck to the car window on the driver's door.

Karn asked Moore who could have been responsible. Moore replied that he had been involved in a minor traffic accident six weeks earlier with a van owned by Canyon Ranch. The driver of the van, Richard Buccini, apologized and offered to pay for the damage himself. He asked Moore not to report the accident to the police, as he was afraid that a citation would jeopardize his job. However, a bystander had already called the police. When the police arrived, Buccini claimed that Moore was partially at fault. The officer wrote a report on the accident but did not cite Buccini or Moore. Moore told Karn that his own insurance company had paid him for the damage but planned to ask for reimbursement from Canyon Ranch. Moore did not say that Buccini knew this or that he had lost his job as a result of the incident, nor did he report any further contact with Buccini. Moore also told Karn that the threat might relate to his position as president of the Veterinarian Association because it was part of his job to investigate claims against veterinarians. Moore could not, however, identify any particular situations that could relate to this threat.

---

1. The following facts are taken from the State's Opposition to Motion to Suppress, Exhibit C, Officer Karn's Report.

Karn then called the Bomb Unit at the Tucson Police Department, and Detectives Kadous and Weadock responded. Kadous and Weadock spoke with Moore, photographed the scene, and collected the evidence, while Karn interviewed the surrounding neighbors. Several neighbors had heard the noise of the explosion. Most estimated that it had occurred between 12:00 and 12:30 the previous night. One neighbor stated that the noise had occurred at 11:56 p.m. and that he had been alarmed and immediately telephoned 911. Karn's report includes the fact that the call was made, along with its documenting number.

At about noon on May 12, 1988, Kadous went to Buccini's apartment to interview him. Kadous was aware only that Buccini and Moore had been involved in an automobile accident in March and that Moore could not think of anyone but Buccini who could have had a reason to threaten him. At the time of the interview, Kadous was apparently still uncertain about the exact time of the bombing, although he had spoken with Karn and possibly read her report disclosing the existence of the 911 call at 11:56. (Transcript of Hearing on Motion to Suppress—Kadous' statement (HT).)

Buccini was cooperative when Kadous approached him, and invited him in. Kadous conducted a "pretape interview," the content of which is disputed, and a taped interview. It is undisputed that Buccini denied having any involvement in the bombing and stated that he was at the Harp and Shamrock Bar until between 12:00 and 12:30 that night, giving the names of at least two witnesses who could verify this. (HT at 26.) Buccini then stated that after he left the bar, he went to his parents' house, where he had a sandwich and spoke with his sister and father. He left his parents' house at approximately 1:00 a.m. and went home.

After telling Kadous about the events of May 8, Buccini signed a form giving Kadous consent to search his apartment.

During the search, Kadous found gun powder and certain types of fuses. Buccini explained that he was formerly an employee of Jensen's Custom Ammunition and that he had a hobby of reloading ammunition. Buccini also mentioned, apparently even before the search, that he had used cannon fuse obtained at Jensen's to try to detonate bleach and mothballs, and that he and a friend, Carl Weisel, at one time used to go out to dirt caves and set off grenade simulators.

Buccini was still employed at Canyon Ranch and had to be at work at 2:00 p.m. that day, so the search terminated after Kadous took possession of the gun powder and fuses. Kadous admits that Buccini was completely cooperative and even assisted Kadous as he searched. (HT at 44.)

Following the consent search and Buccini's departure for work, Kadous made a telephonic request for a search warrant.[2] He sought to search Buccini's apartment and car for any "materials," "tools," or "equipment" that could be used to "construct an explosive device." Kadous described the March car accident and the May bombing incident. He explained that he had interviewed Buccini and that Buccini told him "he was out around at night at the time of the bombing and did not do it but did not have any other people to provide an alibi where he was at." He said that Buccini had consented to a search, during which he discovered the fuses and gunpowder. He concluded that "while searching the residence Mr. Buccini was definitely in a hurry and was inferring that I leave the residence so that he could go to work at 1400 hours." He stressed that a complete search had not been done and that he believed that evidence would be concealed or destroyed if the residence was not searched immediately.[3]

A superior court judge, sitting as a magistrate (see A.R.S. § 1–215(13)), issued the search warrant, and Kadous conducted a

---

2. Under A.R.S. § 13–3914(C), a magistrate may take the affiant's oral statement under oath by telephone. This statement is recorded and deemed to be an affidavit for purposes of issuance of a search warrant.

3. The relevant text of the search warrant affidavit is set forth in Appendix A to this opinion.

search of Buccini's apartment and car, which yielded several items of evidence. Following Detective Kadous' testimony before a Pima County grand jury, Buccini was indicted on several counts.

Buccini filed a motion to suppress the evidence seized pursuant to the search warrant on the ground that Kadous omitted or misrepresented material facts in the affidavit. Specifically, Buccini claimed the affidavit omitted material facts as to Buccini's alibi, falsely stated there were no alibi witnesses, and falsely implied that Buccini attempted to terminate the search before all the evidence was uncovered, thus giving Kadous reason to think that Buccini would later conceal or destroy evidence. Buccini claimed that if Kadous had not made these material omissions and misrepresentations, the magistrate would not have found probable cause to issue the search warrant.

The trial court ordered an evidentiary hearing on the motion to suppress. Buccini and Kadous testified extensively at the hearing. At the conclusion of the testimony, the trial court granted the motion to suppress. The trial judge found that Kadous falsely stated in the affidavit that Buccini did not have anyone to confirm his alibi. The trial judge also found that the affidavit omitted the information about where Buccini claimed to have been on the night of the bombing and the names of his alibi witnesses. The judge believed that including this additional information would have prompted the magistrate issuing the warrant to inquire whether Kadous had attempted to verify the alibi. The trial judge also found that the affidavit falsely implied that Buccini was uncooperative. Instead, the affidavit should have included the truthful statement that Buccini was cooperative throughout the investigation. The judge concluded that once the false information was eliminated and the omitted material information added, the affidavit was insufficient to show probable cause.[4]

Upon the state's motion, the case was dismissed without prejudice. The state then appealed from the suppression order (*see* A.R.S. § 13–4032(7)), alleging that the trial court used an incorrect standard to judge the contents of the affidavit and therefore abused its discretion in suppressing the evidence.

 The court of appeals correctly noted that a defendant may challenge the veracity of factual statements contained in an affidavit supporting the issuance of a warrant. *Buccini*, 165 Ariz. at 110, 796 P.2d at 912 (citing *Franks*, 438 U.S. 154, 98 S.Ct. 2674). Applying *Franks'* two-pronged test, the court first assumed, without deciding, that Buccini had proved the existence of a falsehood made with the requisite mental state, *i.e.*, with knowledge, intent, or reckless disregard. Turning to *Franks'* second prong, the court held that even after the affidavit was redrafted to exclude the false information and include the omitted material information, "it is clear that probable cause existed to believe that these items would be found in Buccini's apartment and automobile." *Id.* Concluding, therefore, that the trial court had abused its discretion, the court vacated the suppression order and remanded the case. *Id.* 165 Ariz. at 111, 796 P.2d at 913.

Buccini then petitioned for review, asserting that the court of appeals erred in disregarding the findings of the trial court judge, which were based on her assessment of the "facts and witness credibility," and improperly substituted its own judgment on the facts to find that the search warrant was supported by probable cause.

## DISCUSSION

### A. The Parties Assert that Abuse of Discretion Standard Applies

Buccini argues that a trial court's ruling on a motion to suppress must be upheld absent an abuse of discretion, and that its findings of fact underlying the motion to suppress must be accepted unless clearly erroneous. Petition for Review (PR) at 14–15. According to Buccini, the trial court's finding that the redrafted search warrant did not establish probable cause was essentially a factual determination.

---

4. The trial court's order is set forth in Appendix B to this opinion.

PR at 14. Thus, the court of appeals erred in redrafting the affidavit and then reversing "the factual determinations of the trial judge in determining probable cause." PR at 14.

Agreeing that the appropriate inquiry is whether the trial court abused its discretion, the state claims, first, that the trial court did not find that Kadous intentionally, knowingly, or recklessly lied to the magistrate. Opposition to PR at 5–6. Second, even if such falsehoods are assumed to exist and deleted from the affidavit, the redrafted affidavit contains facts that show probable cause.

### B. Review of a Trial Court's Findings at a *Franks* Hearing

#### 1. *Allegations Pertaining to Falsity of Averments*

■ In *Franks*, the Supreme Court held that a defendant is entitled to a hearing to challenge a search warrant affidavit when he shows (1) that the affiant knowingly, intentionally, or with reckless disregard for the truth included a false statement in the affidavit, and (2) the false statement was necessary to the finding of probable cause. 438 U.S. at 155–56, 98 S.Ct. at 2676. The defendant must establish the first prong of the test by a preponderance of the evidence before the court may set the false material aside and view the affidavit's remaining content to see whether it is sufficient to establish probable cause. *Id.* at 156, 98 S.Ct. at 2676. If the affidavit is then insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.*

#### 2. *Nature of the Falsehood*

This court has followed *Franks* when considering challenges as to the truthfulness of factual statements in a search war-

rant affidavit. *State v. Carter*, 145 Ariz. 101, 108, 700 P.2d 488, 495 (1985); *State v. Poland*, 132 Ariz. 269, 279, 645 P.2d 784, 794 (1982). In *Carter*, we also held that where the falsehoods or omissions were deliberate or reckless, the court must redraft the affidavit by deleting the falsehoods and adding the omitted material facts before moving on to the probable cause determination. 145 Ariz. at 109, 700 P.2d at 496. The trial judge in this case clearly redrafted the affidavit in accordance with *Franks* and *Carter*, and also, we assume, followed the law in determining that the misstatements and omissions of material fact were made with the requisite state of mind, before finding the remaining facts insufficient to establish probable cause.[5]

■ On appeal, different standards are used to review the trial court's findings as to whether the affiant included a knowing, intentional, or reckless misstatement of fact and whether the redrafted affidavit establishes probable cause. A trial court's finding on whether the affiant deliberately included misstatements of law or excluded material facts is a factual determination, upheld unless "clearly erroneous." *United States v. Fawole*, 785 F.2d 1141, 1145 (4th Cir.1986); *United States v. Elliott*, 893 F.2d 220, 222 (9th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 268, 112 L.Ed.2d 224 (1990); *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir.), *cert. denied*, 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 331 (1988); *United States v. Jenkins*, 901 F.2d 1075, 1079 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 216 (1990). This standard is consistent with the general body of law holding review for clear error appropriate where the applicable legal standard provides for a strictly factual test, such as state of mind. *See United States v. McConney*, 728 F.2d 1195, 1203 (9th

---

5. The judge's order did not explicitly state that the false averments were made knowingly, intentionally, or recklessly but, given that the affiant both knew the correct facts while swearing to false facts and omitted other facts that he knew, the conclusion seems inescapable. Also, there is no other explanation for the judge's ruling under *Franks'* second prong. *Franks* was thoroughly discussed at argument and explicitly addressed by the trial judge. HT at 3–7. In suppressing under *Franks'* second prong, the trial judge necessarily considered and resolved the issues under the first.

Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■ In this case, as Buccini notes, the trial judge was in a unique position to judge Kadous' credibility and determine that he was on notice of material facts that he either misstated or omitted entirely from the affidavit. The Court in *Franks* stressed that the showing for probable cause must be "truthful, in the sense that the information put forth is believed or appropriately accepted by the affiant as true." 438 U.S. at 165, 98 S.Ct. at 2681. It is clear that Buccini told Kadous of his alibi and named several alibi witnesses. The evidence at the hearing also showed that Kadous knew Buccini was still employed at Canyon Ranch and knew that he had to be at work that day. Therefore, the evidence supports the trial judge's implicit finding that Kadous at least recklessly [6] misstated material facts by swearing under oath that Buccini did not have anyone to substantiate his alibi, and by inferring that Buccini was hurrying Kadous in order to prevent him from discovering further evidence. We cannot conclude, therefore, that the trial judge committed clear error or abused her discretion in making this finding. *Cf. State v. Claxton,* 122 Ariz. 246, 248, 594 P.2d 112, 114 (Ct.App.1979) (officer's statement in the affidavit that defendant was in possession of merchandise was found to be "knowingly and intentionally false" or "made with reckless disregard for the truth" where officer admitted at hearing that there was, at best, "only a possibility that jewelry was back in [defendant's] possession").

We conclude that the trial judge was correct in following the first prong of *Franks* and redrafting the search warrant affidavit to exclude the material misstatements and include the relevant omitted facts. We must now determine whether the redrafted search warrant was sufficient to establish probable cause.[7]

### 3. *The Probable Cause Issue*

■ The court of appeals apparently reviewed the trial court's probable cause determination under an abuse of discretion standard. *Buccini,* 165 Ariz. at 110, 796 P.2d at 912. Although this court has never expressly considered this issue, we believe that de novo review is the proper standard to review a trial court's finding as to whether a redrafted search warrant affidavit is sufficient to establish probable cause. *See, e.g., Elliott,* 893 F.2d at 222; *Dozier,* 844 F.2d at 705; *United States v. Grandstaff,* 813 F.2d 1353, 1355 (9th Cir.), *cert. denied sub nom. Brown v. United States,* 484 U.S. 837, 108 S.Ct. 119, 98 L.Ed.2d 78 (1987); *see also McConney,* 728 F.2d at 1203 (noting that the United States Supreme Court has held that the mixed question of probable cause is treated as a question of law and reviewed de novo).

■ Although in most instances a *magistrate's* finding that sufficient probable cause exists to issue a search warrant will not be overturned unless it is clearly erroneous, this rule does not apply when a *trial court* reviews an affidavit that was submitted to the magistrate and later found to have been supported by false statements. *Elliott,* 893 F.2d at 222. Under these circumstances, the trial court must undertake an independent review of the effect of the false statements on probable cause because "the question turns on the consequences of

---

**6.** It was not necessary for the trial court to determine which of the three mental states Kadous possessed. Under the case law that preceded *Franks,* a misstatement by a government officer in the affidavit made with intent to deceive the magistrate was held to void the warrant altogether. 2 W. LA FAVE, SEARCH & SEIZURE § 4.4, at 198 (2d ed. 1987). This is still the law in some jurisdictions. *See, e.g., State v. Malkin,* 722 P.2d 943 (Alaska 1986). However, most jurisdictions adhere to the position set forth in *Franks* that intentional and reckless falsehoods have an identical effect and do not provide grounds for voiding the warrant

unless, after their deletion, the warrant does not establish probable cause. 2 W. LA FAVE, *supra* § 4.4, at 199. As La Fave notes, this rule makes it unnecessary for trial judges to make the "difficult finding of whether a particular misrepresentation was intentional instead of reckless." *Id.*

**7.** The search warrant affidavit, redrafted in strict accordance with the trial judge's factual findings, is set forth in Appendix C to this opinion.

a fraud on the issuing magistrate which that magistrate was not in a position to evaluate." *Id.* Because the magistrate's discretion was vitiated by fraud, the question turns on the legal effect of the correct facts. De novo review of the trial court's finding as to the existence of probable cause is therefore appropriate. *Id.*

■ Moreover, as the *McConney* court noted, de novo review is proper when a mixed question of law and fact implicates constitutional rights. 728 F.2d at 1203. Clearly, when we are required to apply the legal standard for probable cause, we must go beyond the facts of the case and consider the "abstract legal principles that inform constitutional jurisprudence." *Id.* Other state courts follow the rule of de novo review as well. *See, e.g., State v. Rubio*, 115 Idaho 873, 771 P.2d 537 (App.), *rev. denied*, 117 Idaho 509, 788 P.2d 1332 (1989); *People v. Caserta*, 123 Ill.App.3d 608, 79 Ill.Dec. 52, 463 N.E.2d 190 (1984); *see also People v. Loewen*, 35 Cal.3d 117, 196 Cal.Rptr. 846, 850, 672 P.2d 436, 440 (1983) (whether search was "reasonable" within the meaning of the constitution is a question of law, and appellate court must exercise its independent judgment, measuring the facts, as found by the trier, against the constitutional standard of reasonableness).

### 4. *Application of the Probable Cause Standard*

■ In undertaking de novo review of the probable cause determination under the redrafted affidavit, we must apply the standard articulated by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Under *Gates*, probable cause exists if "given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 S.Ct. at 2332. In *Carter*, we applied

the *Gates* standard using the following test:

> An officer has probable cause to conduct a search if a reasonably prudent person, based upon the facts known by the officer, would be justified in concluding that the items sought are connected with the criminal activity and that they would be found at the place to be searched.

145 Ariz. at 110, 700 P.2d at 497 (citations omitted).

■ The redrafted affidavit indicates that Kadous knew the following facts at the time he applied for the search warrant: first, Moore, the victim of the bombing, had been involved in a minor traffic accident with Buccini several weeks before the bombing; second, a note reading "drop it" was found on the victim's vehicle; third, Buccini could account for his whereabouts on the night in question and had named several witnesses who could verify his presence at the bar and at his parents' residence before, during, and after the bombing, which occurred at 11:56 p.m.;[8] and finally, Buccini apparently had lawfully experimented with explosives and had gunpowder and fuse in his home.

In this case, the property to be seized constituted items that could be used to make an explosive device. Buccini never denied that he had worked in an ammunition supply store and that he kept such items in connection with his reloading hobby. We have no quarrel, then, with the court of appeals' statement that there was probable cause to believe that such items would be found in the search. *Buccini*, 165 Ariz. at 110, 796 P.2d at 912. However, justification for a search requires more. The inquiry is not whether these items could be found in Buccini's house; the critical question is whether such items were connected with the particular *criminal activity* of which he was suspected.[9]

---

**8.** The dissent speculates that the alibi was not airtight. *Infra* at 560, 810 P.2d at 188. From the facts known to Officer Kadous, however, the alibi was complete. It certainly might have been disproved by police investigation, but supplying misinformation to the magistrate does not qualify as investigation.

**9.** The dissent infers that there was reason to believe material would be found in Buccini's home that might be used for illegal activities.

*Gates,* 462 U.S. at 2388, 103 S.Ct. at 2322; *Carter,* 145 Ariz. at 110, 700 P.2d at 497. Any other result would justify search of any premises connected with the use, distribution, or sale of guns or explosive materials. The items to be seized were not contraband, nor are the materials or equipment in question "inherently criminal." Thus, the strength of the inference that the items were connected with criminal activity depends upon the strength of the evidence indicating that Buccini was responsible for the bombing.

° The affidavit recounts the fact that Buccini and Moore were involved in a traffic accident. There was no evidence that the encounter was hostile or that Buccini later evinced any threatening behavior toward Moore. Further, there was no evidence that the note reading "drop it" was tied in any way to Buccini. It is not alleged in the affidavit or otherwise that Moore or his insurer had instituted any type of proceedings against Buccini or that Buccini was aware of any threat to do so. Thus, the phrase "drop it" seems to have little relevance when related to an incident that occurred weeks earlier. In short, the affidavit does not show that, so far as Buccini knew, Moore had anything to "drop."

The facts relating to Buccini's alibi, then, were critical to the probable cause determination. If Buccini had a firm alibi for the time of the bombing, there would be no basis to believe that the items in his home were connected to the bombing, and therefore no probable cause. Absent facts indicating that the alibi was untrue, we cannot say that a reasonably prudent person would be justified in concluding that the items sought were connected with criminal activity. To the contrary, the officer's deliberate or reckless omission and misstatement of material facts indicates that he was acting mainly upon a suspicion or hunch that Buccini was responsible for the bombing. An officer's mere suspicion that a search will reveal items connected to criminal activity is not sufficient to establish probable cause. *United States v.*

*Infra* at 560–561, 810 P.2d at 188–89. The point is irrelevant. The affidavit submitted by Officer Kadous sought a warrant to search for evidence of a particular bombing, not for evidence of

*Kandlis,* 432 F.2d 132 (9th Cir.1970); *State v. Hutton,* 110 Ariz. 339, 341, 519 P.2d 38, 40 (1974). To the contrary, as the United States Supreme Court pointed out in *Johnson v. United States:*

> The point of the Fourth Amendment, which is often not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

We conclude, therefore, that the redrafted affidavit does not provide probable cause to support the issuance of the warrant. The redrafted affidavit fails to show probable cause connecting Buccini or Buccini's home with the crime. While it shows that he possessed property of the type that might be connected with the crime, it also shows that this possession is explained and is not refuted by any facts cited in the affidavit. Further, the redrafted affidavit shows an alibi for the crime, and, again, the affidavit provides no facts indicating the alibi to be untrue or possibly untrue.

■ Because the materiality of false statements or omissions is reviewed de novo, we need not accord any special deference to the trial judge's findings in this regard. *See Grandstaff,* 813 F.2d at 1355. However, in this case, given the importance of the alibi to the probable cause determination, we are compelled to agree with the trial judge's conclusion that had Kadous truthfully revealed the fact that Buccini had an alibi and witnesses, the magistrate would have been prompted to inquire whether Kadous had attempted to verify the alibi. Thus, the omission was material in that it rendered the affidavit "substantially misleading" and was also necessary

other illegal activities, such as the manufacture of firecrackers. *Cf. infra* at 560–61, 810 P.2d at 188–89.

to the finding of probable cause. *See People v. Aston,* 39 Cal.3d 481, 216 Cal.Rptr. 771, 780, 703 P.2d 111, 120 (1985) (citing *People v. Kurland,* 28 Cal.3d 376, 168 Cal. Rptr. 667, 618 P.2d 213 (1980)) (omissions are material where there is a "substantial possibility" that the omitted facts would have altered a reasonable magistrate's probable cause determination).[10]

We realize that probable cause is a somewhat "fluid concept" that turns on "the assessment of probabilities in particular factual contexts." *Gates,* 462 U.S. at 232, 103 S.Ct. at 2329. We also agree that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause...." *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984). However, even if this were a close case on the probable cause finding, policy considerations militate in favor of resolving this probable cause determination in the defendant's favor.

The rule in non-*Franks* cases considers the general presumption of validity of a search warrant and the deference given to a magistrate's determination of probable cause in concluding that in a "doubtful or marginal case a search under a warrant may be sustainable where without one it would fail." *See* 2 W. LA FAVE, SEARCH & SEIZURE § 4.4 at 199 (2d ed. 1987) (quoting *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)). The same rule, however, does not apply to a *Franks* case. To the contrary:

> [W]hen it has been established that the earlier finding of probable cause was based upon a broader set of "facts," some of which are now shown to be false, there is no longer any reason to give deference to that earlier finding. Thus, when a court reassesses a search warrant affidavit with the false allegations excised, a "doubtful or marginal

case" should be resolved in the defendant's favor. That is, in such circumstances the probable cause determination should be made as it would upon a motion to suppress evidence obtained without a warrant.

*Id.*

■■ The policy underlying *Franks* seeks to mitigate the dangers of the ex parte procedure used to obtain a search warrant, and to deter over-zealous officers from supplying false information in their efforts to obtain access to the constitutionally protected privacy of one's home or car. *See Franks,* 438 U.S. at 168–169, 98 S.Ct. at 2682–83. We firmly adhere to these policies and believe that where the officer has deliberately or recklessly made material misstatements and omissions in the original affidavit, it is appropriate to resolve marginal probable cause determinations in such a manner as will best uphold the integrity of the fourth amendment.

## CONCLUSION

We hold that an appellate court must use a dual standard to review a search warrant redrafted after a *Franks* hearing. The factual determinations of the trial judge as to the officer's knowing, intentional, or reckless misstatements or omissions must be reviewed under a "clearly erroneous" standard. Under that standard, the trial court did not err in its implicit finding that the affidavit was, at least, recklessly false.

The legal determination of probable cause, however, must be reviewed de novo. In this case, we do not find that the redrafted affidavit was sufficient to support probable cause for the issuance of a search warrant. Therefore, we vacate the court of appeals' opinion and affirm the trial

---

**10.** *Cf. People v. McDaniel,* 16 Cal.3d 156, 127 Cal.Rptr. 467, 478, 545 P.2d 843, 854 (in a bombing case, affidavit found to support probable cause determination under search warrant for defendant's car where it included the following facts: defendant was identified as being at the trailer which was later bombed; defendant was overheard speaking of his ability and inclina-

tion to use explosives for criminal purposes; defendant's car was seen in the immediate vicinity of the explosion; defendant told officers after his arrest that he was experienced in the use of explosives and that there might be some explosives in his car), *cert. denied,* 429 U.S. 847, 97 S.Ct. 131, 50 L.Ed.2d 119 (1976).

court's order suppressing the evidence obtained under the search warrant.

GORDON, C.J., and MOELLER, J., concur.

CAMERON, Justice, specially concurring:

The term probable cause has been troublesome since the beginning of our republic. Chief Justice John Marshall in 1813 stated:

> [T]he term "probable cause," according to its usual acceptation, means less than evidence which would justify condemnation.... It imports a seizure made under circumstances which warrant suspicion.

*Locke v. United States*, 7 Cranch 339, 3 L.Ed. 364 (1813).

Others have tried to bring some harmony into the meaning stressing that:

> [There is a] difference between what [evidence] is required to prove guilt in a criminal case and what [evidence] is required to show probable cause for arrest or search.... There is a large difference between the two things to be proved, as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them.
>
> \* \* \* \* \* \*
>
> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

*Brinegar v. United States*, 338 U.S. 160, 173, 175, 69 S.Ct. 1302, 1309, 1310, 93 L.Ed. 1879 (1949).

> To show probable cause it is not necessary that the arresting officer should have had before him legal evidence of the suspected illegal act. It is enough if the apparent facts which have come to his attention are sufficient in the circumstances, to lead a reasonably discreet and prudent man to believe that liquor is illegally possessed in the automobile to be searched.

*Husty v. United States*, 282 U.S. 694, 700–01, 51 S.Ct. 240, 241–42, 75 L.Ed. 629 (1931) (citations omitted).

> Evidence required to establish guilt is not necessary. On the other hand, good faith on the part of the arresting officers is not enough. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing the offense has been committed.

*Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959) (citations omitted).

> [P]robable cause ... is [a] reasonable ground of probability supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused guilty. "Probable cause" or "reason to believe", therefore, is like a third-quarter percentile; it is more information than would justify the officer saying, "From all the circumstances I suspect this man", but it need not be such information as would justify the officer in saying, "From all the circumstances I know this is the man".

*Monroe v. Pape*, 221 F.Supp. 635, 642–43 (D.C.Ill.1963) (citations omitted).

Probable cause is more than mere suspicion. Facts that would cause the officer to investigate the matter further differ from facts that support a finding of probable cause. In this case, absent the false statements, the affidavit supported only a mere suspicion of defendant's connection to the pipe bomb.

Defendant's actions when questioned became important. His cooperation with the authorities is a point in his favor, though not conclusive. The inference in the affidavit, that the defendant did not cooperate and wanted to avoid the police, might, if true, provide the magistrate with the missing link to warrant a prudent man to rationally believe that there was probable cause to issue the warrant.

Because the defendant had the capacity to make a pipe bomb, a capacity he no

doubt shared with others in the community, does not mean he made the bomb in question. The officer should have proceeded to investigate the matter to the point that he either found probable cause or excluded defendant as a suspect. The officer's good faith belief that defendant made the bomb is not enough. Probable cause exists when the facts and circumstances known to the officer were such that a reasonable person could believe defendant committed the crime, or was in possession of evidence that would connect defendant to the crime. *Henry*, 361 U.S. at 102, 80 S.Ct. at 171. Furthermore, I note that when an affidavit is knowingly false in part, it tends to infect the whole affidavit and makes the state's burden more difficult.

I would affirm the decision of the trial court.

CORCORAN, Justice, dissenting:

I respectfully dissent because, even when the affidavit is redrafted to exclude the false information and take into account the omitted "alibi," sufficient evidence exists to support a reasonable finding of probable cause.

Under the *Gates* test, probable cause exists if a reasonable person would conclude "that the items sought are connected with criminal activity and that they would be found at the place to be searched." *State v. Carter*, 145 Ariz. 101, 110, 700 P.2d 488, 497 (1985). The majority admits probable cause to believe that the seized items would be found in the search, but refuses to acknowledge that the items sought are connected with criminal activity because it believes (1) that Buccini's "alibi" negates any basis to think he was responsible for the bombing, and (2) that the gunpowder and fuses in question are not "inherently criminal."

Buccini's explanation of his whereabouts, however, is not an alibi. "Alibi" is a Latin term meaning "elsewhere" or "in another place." *State v. Hubbard*, 351 Mo. 143, 151, 171 S.W.2d 701, 706 (1943). In a criminal proceeding, "alibi" refers to a defense or plea that the defendant was at a different place so remote or under such circumstances that he could not have committed the charged offense. *Black's Law Dictionary* 71 (6th ed. 1990).

At the time the investigating officer submitted the oral, telephonic affidavit requesting a search warrant, the police believed that the bomb exploded on May 8 around 12:30 a.m., about the same time that Buccini, according to the redrafted affidavit, arrived at his parents' house after leaving the Harp and Shamrock Bar. This information does not foreclose all probability of guilt, but instead suggests that Buccini had the opportunity to plant the bomb on his way to see his father and sister. The redrafted affidavit simply confirms the investigating officer's beliefs expressed in the original affidavit; Buccini was in fact "out around at night at the time of the bombing" and "did not have any other" witnesses who could account for his actions from the time he left the bar, which is located near the victim's residence, until he reached his parents' house. The majority cannot assume, therefore, that the magistrate would have altered his ruling had the police recounted Buccini's story in more detail.

A reasonable person could have also concluded at the time the search warrant was issued that at least some of the items seized in the consent search were illegally possessed, and therefore connected with illegal activities. The process of reloading ammunition *does not* require cannon or safety fuse. Such fuse is purchased and used with one purpose in mind—triggering explosive devices. The manufacturing and possession of small fireworks, not to mention the more powerful bleach/mothball charges and grenade simulators described in the redrafted affidavit, are strictly regulated under Arizona statutes. *See* A.R.S. §§ 36–1601 to –1608 (prohibiting the sale, use, or possession of any fireworks); §§ 13–3101 to –3104 (prohibiting the making and possession of "prohibited weapon[s]," including explosives, bombs, grenades, or a combination of materials designed or intended for use in making or converting a device into a prohibited weapon). Buccini does not claim an authorized

or permitted use under municipal, state, or federal laws. *See* §§ 36–1605, 13–3102(C)(3). In short, we are not dealing with a gun-owner who simply reloads ammunition for a hobby. Rather, we have, at the very least, an explosives enthusiast who not only collects demolition paraphernalia, but enjoys improvising and setting off illegal bombs.

By dissenting, I do not condone any police officer's attempt to sway a magistrate's probable cause determination with false statements or material omissions. At this juncture, however, the propriety of the officer's conduct is immaterial. When the court finds, as in this case, that an affiant knowingly, intentionally, or recklessly included a false statement or omitted relevant facts, the issue becomes whether the false or omitted information was necessary to the finding of probable cause. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978).

Here, the omitted "alibi" information and the statement that Buccini appeared "in a hurry" during the consent search were not necessary to the magistrate's ruling. As the court of appeals correctly reasoned, "[t]he bombing, the note left on the victim's vehicle, and the victim's prior encounter with Buccini, together with the powder and fuses found during the consent search, were *alone* sufficient to support the issuance of the warrant." *State v. Buccini,* 165 Ariz. 108, 110, 796 P.2d 910, 912 (App. 1990) (emphasis added). I believe we should reserve for a more appropriate case the issue of whether the police should verify an alleged alibi before seeking a search warrant.

## APPENDIX A

### SEARCH WARRANT AFFIDAVIT

On May 8th at 0030 hours a pipe bomb was placed in the garage of a Howard Moore on 9086 E. Holmes. The device was detonated causing damage to the garage and the victims' vehicle. Also attached to the car window was a note which stated to "drop it." An interview with Mr. Moore revealed that on March 31, 1988 he was involved in an accident with a Richard Buccini. Buccini insisted on paying for the damage so that he would not lose his job as a chauffeur-driver for Canyon Ranch Resort. Police were called anyway and a report was made. On May 12, this day, at 1130 hours I made contact with Richard Buccini at his residence. He invited me in and I interviewed him regarding this incident. He stated that he was on probation at Canyon Ranch Resort where he works because of the accident he was involved in as well as another vehicle accident that occurred a week after the March 31 accident. He also stated that he was out around at night at the time of the bombing and did not do it but did not have any other people to provide an alibi where he was at. I asked him if he would sign a consent to search form which he did at 1230 hours.

During the search I found gun powder, safety fuse and green cannon fuse which was consistent with the fuse used on the explosive device found at the garage area. While searching he stated that he got the items such as the cannon fuse to make an improvised explosive device using bleach and mothballs which he had learned in a publication and with a friend of his at Canyon Ranch. He also stated that he received some military paraphernalias [sic] and explosives from a Carl Weisel who last year the Tucson Police Department in conjunction with the FBI conducted an investigation in which he was found in possession of military ordinance [sic] and explosives. Those were also confiscated. While searching the residence Mr. Buccini was definitely in a hurry and was inferring that I leave the residence so that he could go to work at 1400 hours. The search was concluded and the items aforementioned were seized. A complete search was not done of the residence or the vehicle. It is believed that the evidence may be concealed or destroyed if not searched immediately.

## APPENDIX B

### TRIAL COURT'S ORDER

THE COURT FINDS that the statement in the affidavit that the defendant "did not have any other people to provide an alibi

where he was at." is false. THE COURT FURTHER FINDS that the affidavit should have included the information that the officer had at the time which was that defendant had stated he was at the "Harp and Shamrock Bar" during part of the time in question and that he had listed alibi witnesses including Dwayne Nanna, among others. Furthermore, the officer should have listed that the defendant had, at approximately 12:30, gone to his parents' home and that his father and sister had noted his presence in the residence at that time.

THE COURT FURTHER FINDS that with the deletion of the false statement and the inclusion of the alibi statements, that the Judge would have been prompted to inquire further of the police officer as to his investigative efforts with regard to verifying the presence of the defendant with the alibi witnesses.

THE COURT FURTHER FINDS that the inclusion of the implication that the defendant was rushing the police officer in his search was incorrect. Rather, the officer should have included a statement that the defendant was, in fact, cooperating with the officer throughout the voluntary search, and that it was the officer who concluded the search based on his own knowledge that the defendant had to go to work that day.

Accordingly, THE COURT FINDS the remaining affidavit is insufficient to show probable cause and

IT IS ORDERED suppressing all fruits of the illegal search.

Minute Entry, March 29, 1989.

## APPENDIX C

## REDRAFTED SEARCH WARRANT AFFIDAVIT

On May 8 at 0030 hours a pipe bomb was placed in the garage of a Howard Moore on 9086 E. Holmes. The device was detonated causing damage to the garage and the victim's vehicle. Also attached to the car window was a note which stated to "drop it." An interview with Mr. Moore revealed that on March 31, 1988 he was involved in an accident with a Richard Buccini. Buccini insisted on paying for the damage so that he would not lose his job as a chauffeur-driver for Canyon Ranch Resort. Police were called anyway and a report was made. On May 12, this day, at 1130 hours I made contact with Richard Buccini at his residence. He invited me in and I interviewed him regarding this incident. He stated that he was on probation at Canyon Ranch Resort where he works because of the accident he was involved in as well as another vehicle accident that occurred a week after the March 31 accident. ~~He also stated that he was out around at night at the time of the bombing and did not do it but did not have any other people to provide an alibi where he was at.~~ *He stated that he was at the Harp and Shamrock Bar on the night of the bombing, and named witnesses who could verify this, including Dwayne Nanna, among others. He also stated that he went to his parents' home at approximately 12:30 and that his father and sister had noted his presence in the residence at that time.* I asked him if he would sign a consent to search form which he did at 1230 hours.

During the search I found gun powder, safety fuse and green cannon fuse which was consistent with the fuse used on the explosive device found at the garage area. While searching he stated that he got the items such as the cannon fuse to make an improvised explosive device using bleach and mothballs which he had learned in a publication and with a friend of his at Canyon Ranch. He also stated that he received some military paraphernalia and explosives from a Carl Weisel who last year the Tucson Police Department in conjunction with the FBI conducted an investigation in which he was found in possession of military ordnance and explosives. Those were also confiscated. ~~While searching the residence Mr. Buccini was definitely in a hurry and was inferring that I leave the residence so that he could go to work at 1400 hours. The search was concluded and the items aforementioned were seized.~~ *Buccini was cooperative throughout the search. I concluded the search because I*

*knew that Buccini had to go to work at 1400 hours. The aforementioned items were seized.* A complete search was not done on the residence or the vehicle. It is believed that the evidence may be concealed or destroyed if not searched immediately.